**Daniel MORALES, Petitioner,**

v.

**Thomas J. MILLER, Superintendent, Woodbourne Correctional Facility, Respondent.**

**No. 96–CV–5638 (JG).**

United States District Court, E.D. New York.

March 10, 1999.

Daniel Morales, New York City, petitioner pro se.

Charles J. Hynes, District Attorney, Kings County by Victor Barall, Assistant District Attorney, Brooklyn, NY, for respondent.

## MEMORANDUM AND ORDER

GLEESON, District Judge.

Following a jury trial in New York Supreme Court, Kings County, petitioner *pro se* Daniel Morales was convicted of Manslaughter in the First Degree. Morales now petitions this Court, pursuant to 28 U.S.C. § 2254, for a writ of habeas corpus. In support of his petition, Morales argues that he was denied due process when: (1) in response to a jury request for a supplemental definition of intent, the trial court refused to include an additional instruction on intoxication as well; (2) the prosecutor impeached defense witness Eric Mendez by referring to prior conversations between Assistant District Attorneys and Mendez, thereby making the prosecutor an unsworn witness; (3) the prosecutor impeached Mendez with his failure to come forward promptly after petitioner's arrest; (4) the prosecutor referred on summation to the prosecutors' prior conversations with Mendez and Mendez's failure to come forward promptly, and stated and/or suggested that Mendez was a liar; (5) at sentencing, the trial court imposed the maximum term of incarceration based on its view that the jury had already shown mercy by acquitting Morales of Murder in the Second Degree.[1]

For the reasons set forth below, the petition is denied.

### BACKGROUND

#### A. The Killing of Gilberto Martinez

Shortly before 8:00 p.m. on April 10, 1993, New York City Police Officers Kurt Trotman and Anthony Cantazaro received a radio call regarding an unconscious male lying on the floor of a bodega at 2233 Pitkin Avenue in Brooklyn, New York. (Supp.Tr.16.)[2] Upon arriving at the scene, Trotman and Cantazaro discovered a male Hispanic named Gilberto Martinez lying face up on the bodega's floor. (*Id.* at 16, 30.) The officers did not immediately notice any injury to Martinez, other than that he was unconscious. (*Id.* at 16–17.)

According to Officer Cantazaro, petitioner Daniel Morales then approached him in the bodega, identified himself, and stated that he had a licensed handgun with him in the store. (*Id.* at 30–31, 34.) Cantazaro asked Morales to show him the paperwork for the gun, and told Officer Trotman about Morales' statement. (*Id.* at 31.) Trotman responded by telling Cantazaro not to pay attention to Morales, who appeared to both officers as if he had been drinking that night and was still under the influence of alcohol.[3] (*Id.* at 31.) At that point, paramedics entered the bodega, pulled up Martinez's shirt, and discovered that he had been shot in the stomach. (*Id.*)

After paramedics removed Martinez from the store and placed him in an ambulance, Cantazaro went back over to Morales, who had remained in the bodega, and asked him about the paperwork for the gun. (*Id.* at 31.) Morales said he didn't know what Cantazaro was talking about. (*Id.* at 32.) In the meantime, Trotman had gone outside the bodega to assist in placing Martinez in the ambulance. (*Id.* at 18.) While outside the bodega, Trotman was approached by an unidentified Hispanic male who had apparently seen Cantazaro speaking with Morales. (*Id.* at 18.) This unidentified male told Trotman that,

---

1. Although Morales' petition presents the claims numbered two through four as a single ground for habeas relief, I have divided them into the three separate claims for the sake of clarity.

2. "Supp.Tr." refers to the transcript of a suppression hearing held before Justice Michael Gary of New York Supreme Court, Kings County on June 7–9, 1994.

3. At the suppression hearing, Cantazaro testified that he could smell alcohol on Morales' breath. (Supp.Tr. at 38.) Trotman also stated that there was a very strong odor of alcohol, and testified that Morales' eyes were red and his face was flushed. (*Id* at 22.)

earlier that evening, Morales had been waving a gun at people and firing it outside the bodega. (*Id.* at 18–19, 24.) Trotman then went back in the bodega and told Cantazaro that they should arrest Morales. (*Id.* at 19, 32.) After Cantazaro arrested and handcuffed Morales, another witness, Renaldo Weir, informed Trotman that, after the shooting, Morales had thrown an object under a staircase in the back of the bodega. (*Id.* at 20, 32.) Weir took Trotman to the staircase, where Trotman found a black revolver. (*Id.* at 20.)

Shortly after being removed from the bodega and transported to Brookdale Hospital, Gilberto Martinez died as a result of the gunshot wound to his stomach. (*Id.* at 47.) Following Martinez's death, Morales was charged with Murder in the Second Degree and Criminal Possession of a Weapon in the Second and Third Degrees. (Affidavit of Victor Barall, dated January 28, 1997 ("Barall Aff.") ¶ 5.)

## B. *Petitioner's Trial*

### 1. *The People's Case*

At trial before Justice Michael Gary of State Supreme Court, Kings County, the People's case consisted of testimony from six witnesses. Martin Tineo, the owner of the bodega, testified that on April 10, 1994, Morales was drinking beer in the store and holding a revolver. (Tr. 221, 230.)[4] Believing that the gun was a toy, Tineo nonetheless told Morales to put it away, and Morales placed the gun in his jacket pocket. (*Id.* at 221, 226–27) Shortly thereafter Martinez entered the store, according to Tineo, and Morales and Martinez began arguing. (*Id.* at 221, 223–24.) Tineo then heard one or two shots and saw Martinez grab his stomach and walk to the front of store, where he collapsed. (*Id.* 228–30.)

Adolfo Ruiz, a friend of Martinez who went with him to the bodega that evening,

testified that he was paying for certain items when he heard Martinez and Morales "mumbling" to each other in the back of the store. (*Id.* at 352–53, 356–58.) After hearing three or four shots that sounded as if they had come from a cap gun, Ruiz turned around and saw Martinez staggering toward the front of the store, where he collapsed. (*Id.* at 356–59, 375–76.) According to Ruiz, he went to the back of the store to confront Morales, who had a beer in his hand and was drinking. (*Id.* at 357, 382.) Morales responding by threatening to shoot Ruiz as well. (*Id.* at 357, 376–77.)

Renaldo Weir testified that he went to the bodega to check on that night's gambling numbers, saw a crowd of people, and noticed Martinez lying on the ground. (*Id.* at 310–11.) After checking Martinez for a pulse and finding that he was still alive, Weir went to the back room of the bodega where the gambling numbers were posted. (*Id.* at 310–12.) As he turned to exit the back room, Weir testified that he saw Morales bend down near a staircase, make a throwing or tossing motion, and then leave the room. (*Id.* at 312, 314, 335–37.)

Officer Trotman testified that upon arriving at the bodega, Weir directed him to the back room where, under a staircase, Trotman recovered a black .22 caliber handgun. (*Id.* at 282–83, 285.) Trotman further testified that he found three spent shell casings and one live shell in the store. (*Id.* at 285.) Dr. Frede Frederic, a medical examiner, testified based on an autopsy report that a single gunshot wound to Martinez's abdomen had perforated the aorta and caused him to die of internal bleeding (*id.* at 395), and Bridgette Garcia, Martinez's niece, stated that she identified Martinez's body at the medical examiner's office on the night of the shooting. (*Id.* at 346.) Finally, Detective Charles Hopkins of the New York City Police Department's Ballistics Unit testified that the three

---

4.  "Tr." refers to the trial transcript of *People v. Morales*, Indictment No. 4371/93, Supreme

Court, Kings County.

spent shell casings and the bullet taken from Martinez's abdomen all came from the gun that Trotman had recovered in the bodega. (*Id.* at 414, 416.)

### 2. *The Defense Case and the Impeachment of Eric Mendez*

The defense case relied on the testimony of two character witnesses and one alibi witness.[5] Carmen Ponce testified that she had known Morales for approximately seventeen years, and that his reputation in the community was that of a "an honest hard working fellow." (*Id.* at 431–32.) Peter McCann also testified that he knew Morales and worked with him intermittently for a period of approximately fifteen years. (*Id.* at 443.) According to McCann, Morales was known as an agreeable, honest, punctual and hard-working person, and was "loved" by everyone in the work community. (*Id.* at 444.)

Eric Mendez testified last, stating that he knew Morales from the neighborhood and that both he and Mendez were in the bodega on the evening of April 10, 1993. (*Id.* at 450–51.) According to Mendez's testimony, Morales and another man were playing the slot machines that were in the back of the bodega, and Mendez was waiting to take his turn. (*Id.* at 453.) Mendez stated that at approximately 7:45 p.m. he heard three shots. (*Id.*) A few seconds later Mendez and some other people in the bodega looked out from the back room and saw a Hispanic man leaning over with one knee on the ground while a tall, long-haired Hispanic man ran out of the store. (*Id.* at 454.) According to Mendez, during the entire time, Morales remained in the back room playing the slot machines. (*Id.* at 455–56.) Mendez further testified that he did not see a handgun in Morales' possession, did not see Morales argue with anyone prior to the shooting, and did not see Morales stoop in the back room or make a throwing motion. (*Id.*)

During the cross-examination of Mendez, Assistant District Attorney ("ADA")

John Bugliosi first established that he had and another ADA, Carl Reeves, had separately called Mendez the previous evening to discuss the case. Specifically, the following exchange took place:

BY MR. BUGLIOSI:

Q: Good morning, Mr. Mendez?

A: Good morning.

Q: You recognize my voice from last night?

A: Yes, I do.

Q: I asked you about the case?

A: Yes.

Q: Did you also receive, before I called you, a call from another District Attorney from my office?

A: Yes, he told me he was your associate.

Q: You had a brief conversation with him too?

A: Yes.

Q: Did I identify myself as a District Attorney and did I say that I wanted to ask you some questions about the case?

A: Yes.

(*Id.* at 457.)

Thereafter, at two points during the cross-examination, Bugliosi attempted to impeach Mendez with the substance of his prior conversations with the ADAs. Mendez testified that approximately three weeks before the trial, he spoke to Morales' mother and informed her that he was "having second thoughts" about testifying on Morales' behalf, because he didn't "really like to get involved in cases like this." (*Id.* at 467.) Bugliosi probed further into the conversation between Mendez and Morales' mother:

Q: She asked you to testify?

A: She told me if I would and I told her, I'd think about it.

Q: Didn't she beg you to go to court?

---

**5.** At trial, Morales was represented by Alan Stutman, Esq.

Q: Beg me?

A: Yes?

Q: No.

Q: Do you remember having that conversation with me last night?

A: Yes.

Q: Didn't you use that word?

MR. STUTMAN [Defense Counsel]: Objection, may we approach, Judge.

(Tr. 467.) Thereupon, the court gave the jury the following instruction: "Once again, ladies and gentlemen, I remind you that it's the question coupled with the answer that constitutes evidence." (*Id.*) The testimony then resumed as follows:

Q: Did she ever express in any way and by she, I mean the defendant's mother, that she wanted you to come to court and testify?

A: Yes, she was pretty upset.

Q: And no question about it, she wanted you to testify very badly?

A: Yes, you could say that. That's her son.

Q: Well, when I use the word, "beg" would that be your word or was that my word?

A: I guess it would be your word.

Q: Do you remember what you told me?

A: Yes, I remember.

Q: What did you say?

A: I told you that I didn't want to get involved in the case to begin with, but she was asking me that if I did see what happened, to please help her son, please. I mean, if that's what you call begging, then she begged.

(*Id.* at 467–68.)

Bugliosi subsequently attempted to impeach Mendez based on the substance of his conversation with ADA Reeves. On direct, Mendez had testified that he recognized the tall, long-haired Hispanic who ran from the bodega after Martinez had been shot. (*Id.* at 454.) On cross, Mendez further testified that he saw the profile of the fleeing perpetrator, and could identify him if shown a picture. (*Id.* at 480.) The following exchange then took place:

Q: Did a Carl Reeves call you on the phone about this case?

A: Yes.

Q: Did he ask you about whether you saw this person's face?

A: Right.

Q: You didn't tell Mr. Reeves that you saw a profile, did you?

A: Yes, I did.

Q: Isn't it true that you told Carl Reeves that you didn't think you would ever recognize this guy?

MR. STUTMAN: Objection.

\*\*\*

Q: You can answer?

A: When I spoke to your colleague last night on the phone, he asked me if I saw—if I could recognize this person in the neighborhood and I told him, yes, I could. That's what I told him and I recorded the conversation on tape.

(*Id.* at 480–81.)

During cross-examination, Bugliosi also inquired into Mendez's failure to come forward and promptly exculpate Morales. Mendez testified on cross that he told his family what actually happened in the bodega on the same day of the shooting, but did not learn until approximately one year later that Morales had been arrested for Martinez's murder. (*Id.* at 464.) The testimony proceeded as follows:

Q: How long did it take you to remember that this person, this defendant couldn't have been the person who did the shooting, that you remember he was standing right next to you?

A: I've always remembered. I didn't want to come forwards [sic] never.

Q: Why not?

A: Because where we live, you don't really get involved in murder cases.

Q: Several people did in this case, didn't they?

MR. STUTMAN: Objection.

THE COURT: Sustained.

Q: Do you know if anybody spoke to the police about what happened in this case?

MR. STUTMAN: Objection.

THE COURT: Sustained.

(*Id.* at 470.) After further cross-examination in which Bugliosi introduced evidence of Mendez's past crimes, the parties rested.

On summation, the defense argued that key prosecution witnesses disliked Morales because his mother was a landlord in the neighborhood and he acted as her rent collector. (*Id.* at 512.) Defense counsel suggested that this provided an incentive for some of the witnesses to testify as they did, and that in any event, the witnesses' testimony that Morales remained in the bodega after shooting Martinez and waited for the police to arrive did not make sense. (*Id.* at 512–513.) Defense counsel also pointed to the testimony of Eric Mendez and stated that, unlike the other witnesses, Mendez had no reason to lie about the events of that evening. (*Id.* at 527–28.)

The prosecution argued on summation that the evidence showed that Morales shot Martinez as a result of an argument in the bodega. (*Id.* at 530–31.) According to the prosecution, there were no inconsistencies in the stories of Martin Tineo, Renaldo Weir and Adolfo Ruiz, and "there was no way that these three people could get together and all concoct a story against this defendant." (*Id.* at 537.) With regard to Mendez, the prosecution pointed out what it argued were inconsistencies and impossibilities in Mendez's version of events, and stated that Mendez's testimony exculpating Morales was a lie. (*Id.* at

558.) Specifically, the prosecutor referred to Mendez's testimony that he had seen the profile of the actual perpetrator, and alluded to the telephone conversation ADA Reeves had had with Mendez on the day before Mendez testified:

> And the biggest point, that was innocuous at first but became very important, was when I asked him if he could describe this person. And he told you that he could. And the point where that got to be interesting and not really predicted by me, since I had had a conversation with him the night before, he says that he saw the profile of the gunman, he saw the side of the person's face.[6] Because obviously he couldn't identify somebody if he had only seen him from the rear.

(*Id.* at 556.) Shortly thereafter, the prosecutor stated as follows:

> But what's important is not that he couldn't recognize who he wants you to believe is the real shooter in this case. What's important is why did he do that? Why is he lying? That's the question that you have to answer as the jury in this case.

(*Id.* at 557–58.)

The prosecutor also questioned the reliability of Mendez's memory and the sincerity of his motivations in light of the fact that approximately one year had passed between the shooting and Mendez's decision to come forward. (*Id.* at 558–59.) In this regard, the prosecutor stated as follows:

> That leads me the point about [Mendez's] memory. He said he only saw the defendant two times, approximately, give or take a time, from the area. Didn't even know his name at the time of the shooting, that's April of '93. All the way down here, one year later, about a year after the crime, he hadn't seen the defendant since then, he tells you. He gets into a conversation with his

**6.** Although ADA Bugliosi's summation suggested that he personally discussed with Mendez whether Mendez had been able to see the perpetrator's profile, the testimony indicated that this conversation was actually between ADA Reeves and Mendez. (Tr. 480–81.)

grandmother and they had a conversation with the defendant's mother, and all of a sudden he realizes that the wrong man is arrested.

(*Id.*) At various other points before concluding his summation, while describing the evidence elicited at trial, Bugliosi stated that Mendez had been "[c]aught in another lie" (*id.* at 559), was "making it up as he goes along" (*id.*), and "has a motive to lie in this case" (*id.* at 560).

### 3. *The Jury Charge, Supplemental Instructions from the Court, and the Verdict*

After giving general instructions in his charge to the jury, Justice Michael Gary set forth the elements of Murder in the Second Degree, Manslaughter in the First Degree, and Criminal Possession of a Weapon in the Second and Third Degrees. (Tr. 594–604.) Justice Gary also charged the jury regarding the definition of intent (*id.* at 591–92), which was described as an element of each of the relevant offenses except Criminal Possession of a Weapon in the Third Degree. (*Id.* at 591–92.) Justice Gary further instructed the jury that intoxication may be considered as a factor that might render a defendant incapable of forming the particular criminal intent that is an element of a charged offense. (*Id.* at 604–06.) Following further instructions, the jury began its deliberations.

The jury sent out several notes during the course of its deliberations, including a note that stated only as follows: "Please explain, define intent." (*Id.* at 619.) In response to this request, Justice Gary repeated his prior instructions regarding the definition of intent; the manner in which a jury may infer intent from a defendant's actions; and the elements of each of the three offenses for which the prosecution was required to establish, beyond a reasonable doubt, that defendant possessed the requisite intent. (*Id.* at 620–21.) After a bench conference that was not transcribed, Justice Gary allowed the jury to resume its deliberations. The following colloquy then ensued:

MR. STUTMAN: I have made the following requests, in that the Court originally charged the jury as to intoxication and its effect on intent. I asked the Court to recharge the jury on intoxication because it does have an effect on the intent. It does affect the definition of intent as it is in this case. I would make that request to this Court.

THE COURT: People?

MR. BUGLIOSI: I would oppose that argument because I don't think there was any reasonable request they wanted a charge on intoxication.

THE COURT: I decline to so charge. You have your exception. We were quite specifically asked to define murder and manslaughter so they could differentiate between the two.

They've sent us a number of notes. They certainly know how to write. They didn't ask anything about effects of intoxication, not mentioned anywhere in their request. I decline to go further than exactly what they asked for.

(*Id.* at 626.) After one further note requesting that the testimony of Tineo be read back, the jury reached its verdict. Morales was acquitted of Murder in the Second Degree, but convicted of Manslaughter in the First Degree. (*Id.* at 628–29.) No verdict was taken on the charges of Criminal Possession of a Weapon.

### 4. *Sentencing*

On July 11, 1994, Justice Gary imposed sentence on Morales. The People argued that the maximum penalty was appropriate because Morales had not admitted any responsibility for the death of Gilberto Martinez and because "[t]he jury basically already cut him a break." (Sent.Tr. at 2–3.)[7] Defense counsel argued that Morales

---

**7.** "Sent.Tr." refers to the transcript of the

sentencing proceedings held before Justice

"had a minimal contact with the criminal justice system" in the past, and that various individuals had commented favorably on Morales' character and his standing in the community. (*Id.* at 4.) The defense counsel further argued that Morales' actions were the result of an "alcoholic interlude," and that Morales had consistently maintained his innocence. (*Id.* at 5.) After addressing the foregoing arguments, Justice Gary stated as follows:

> I don't see that the defendant merits any mercy at this point in time. As the People quite rightly pointed out, the jury has already shown him mercy by finding him not guilty of murder in the second degree. At this time the defendant's act merits only justice, not mercy.

(*Id.* at 7.) Justice Gary thus sentenced Morales to the maximum penalty of eight-and-one-third to twenty-five years incarceration. (*Id.* at 8.)

## C. *The State Appellate Process*

In papers filed on July 27, 1995, Morales appealed his conviction to the Appellate Division, Second Department. (Barall Aff. ¶ 7 & Ex. B.) In the brief filed by Morales' appellate counsel,[8] Morales raised each of the claims presented in this habeas petition. (*See* Barall Aff.Ex. B.) In a memorandum dated January 8, 1996, the Appellate Division found that Justice Gary's refusal to respond to the jury's note with a supplemental instruction regarding intoxication was not error, "inasmuch as the jury's specific request was for an explanation and/or definition of the element of intent, and there was no request for reinstruction on intoxication." *People v. Morales*, 223 A.D.2d 562, 563, 636 N.Y.S.2d 384 (2d Dep't 1996) (per curiam). The Appellate Division also found that the sentence imposed on Morales was not excessive, and that Morales' remaining contentions were "either unpreserved for appellate review or without merit." *Id.*

Gary on July 11, 1994.

In a letter dated January 26, 1996, Morales' appellate counsel applied for permission to appeal to the New York Court of Appeals. (Barall Aff.Ex. D at 1–3.) In this letter, Morales' counsel argued that the trial court erred when, in response to the jury's note requesting an explanation or definition of intent, it refused to recharge the jury regarding intoxication. Specifically, counsel for Morales stated that the issue of intoxication was "directly intertwined" with the issue of intent, and thus the court should have reinstructed the jury on intoxication despite the lack of a specific request. (*Id.* at 2–3.) While the letter from Morales's counsel discussed only this aspect of the jury instructions in detail, it also stated as follows: "appellant requests that the Court of Appeals consider and review all of the issues outlined in defendant-appellant's brief. . . ." (*Id.* at 3.) Copies of the brief that had been submitted to the Appellate Division were enclosed with the letter.

In a letter dated February 1, 1996, Donald M. Sheraw, the Clerk of the Court for the New York Court of Appeals, provided an initial response to Morales's request for permission to appeal. (*Id.* at 4.) In this letter, Sheraw informed Morales' counsel that Judge Carmen Beauchamp Ciparick had been assigned to handle the request for leave to appeal, and instructed counsel that "[a]pplicant's communications to the assigned Judge must be mailed *within three weeks* of the date of this letter, and a copy must be served on the adverse party." (*Id.* (emphasis in original).)

Morales then wrote directly to Judge Ciparick in a letter dated March 15, 1996, urging that Judge Ciparick consider whether the trial court committed prejudicial error during the sentencing. (*Id.* at 8–9.) Relying on what he perceived to be a "blatant and biased comment" made by Justice Gary during sentencing (*i.e.*, that the jury had already shown mercy by acquitting Morales of Murder in the Second

**8.** On appeal, Morales was represented by Lori Shellenberger, Esq. of the Legal Aid Society.

Degree), Morales argued that the decision to impose the maximum possible sentence for Manslaughter in the First Degree resulted from Justice Gary's belief that Morales was actually guilty of the more serious charge. (*Id.* at 9.) On May 29, 1996, Judge Ciparick issued a Certificate Denying Leave in which she stated that Morales' request for leave to appeal was denied because "there is no question of law presented which ought to be reviewed by the Court of Appeals." (Barall Aff.Ex. D at 10; *see also People v. Morales*, 88 N.Y.2d 882, 645 N.Y.S.2d 457, 668 N.E.2d 428 (1996).) This petition followed.

## DISCUSSION

A. *The Exhaustion Requirement*

■ In moving to dismiss the petition, respondent argues that Morales failed to exhaust each of the claims he now presents for federal habeas review. A prisoner seeking a writ of habeas corpus is generally required to exhaust all state remedies before pursuing his claim in federal court. *See* 28 U.S.C. § 2254(b); *see also Grey v. Hoke*, 933 F.2d 117, 119 (2d Cir.1991). To satisfy this requirement, the petitioner must fairly present his federal claims to the highest state court from which a decision can be had, informing the court both of the factual and legal bases for the federal claim asserted. *See Daye v. Attorney General*, 696 F.2d 186, 191 (2d Cir.1982) (en banc), *cert. denied*, 464 U.S. 1048, 104 S.Ct. 723, 79 L.Ed.2d 184 (1984). In other words, "the nature or presentation of the claim must have been likely to alert the court to the claim's federal nature." *Daye*, 696 F.2d at 192. "Citing a specific constitutional provision or relying on federal constitutional precedents alerts state courts of the nature of the claim." *Jones*

*v. Vacco*, 126 F.3d 408, 413–14 (2d Cir. 1997).

■ With regard to Morales' claims regarding the prosecutor acting as an unsworn witness, the impeachment of Morales with his failure to come forward, the prosecutor's comments on summation, and the trial judge's sentencing decision, respondent argues that petitioner did not satisfy the exhaustion requirement. Specifically, respondent contends that because the letter application for leave to appeal did not refer explicitly to these claims, such claims were not fairly presented to the New York Court of Appeals. (Respondent's Memorandum of Law ("Respondent's Mem.") at 4–5.) As noted above, the letter sent by Morales' appellate counsel to the New York Court of Appeals specifically raised only the issue of the supplemental jury charge, and attempted to incorporate by reference the other issues that had been discussed in the brief submitted to the Appellate Division.[9]

In *Grey v. Hoke*, 933 F.2d 117 (2d Cir. 1991), a habeas petitioner had raised three issues in a brief submitted to the Appellate Division, but in a letter application to the New York Court of Appeals, mentioned only one of those issues. *Id.* at 119. The petitioner had also included a copy of his Appellate Division brief with his letter application. *Id.* In response to the state's argument that the petitioner had failed to exhaust the two claims not raised in the application letter, the Second Circuit found that "[t]he only possible indication [from the letter application] that the other two claims were being pressed was the inclusion of a lengthy brief originally submitted to another court." *Id.* at 120. Stating that the New York Court of Appeals does

---

**9.** Although Morales subsequently wrote directly to Judge Ciparick and set forth arguments regarding the sentence imposed by the trial court, respondent contends that the sentencing claim is still unexhausted. According to respondent, because Morales' letter was sent outside the three-week period provided for by the Clerk of the Court, and was unau-

thorized, I should not consider this letter as having fairly presented the sentencing claim to the Court of Appeals. (*Respondent's Mem.* at 5 n. 1.) However, because I find that the letter sent by Morales' counsel fairly informed the Court of Appeals of each of the claims Morales asserts here, I do not reach this issue.

not have "a duty to look for a needle in a paper haystack," *id.* (internal quotation marks omitted), the Second Circuit held that the petitioner had failed to exhaust those claims not referred to in the letter application. *Id.*

District courts within this circuit have adopted differing interpretations of *Grey.* Some courts have adopted an expansive reading, interpreting *Grey* to mean that any claim not discussed in detail in an application letter—even claims incorporated by reference—have not been fairly presented to the state courts. *See, e.g., Jordan v. Lefevre,* 22 F.Supp.2d 259, 261–62 (S.D.N.Y.1998); *Benitez v. Senkowski,* 97 Civ. 7819, 1998 WL 668079, at *8 n. 7 (S.D.N.Y. Sept. 17, 1998); *Morgan v. Bennett,* CV–96–4106, 1998 WL 315135, at *9 (E.D.N.Y. May 27, 1998); *Brooks v. Kelly,* No. 88–CV–0631E, 1993 WL 350188, at *3 (W.D.N.Y. Sept. 10, 1993).

Two other lines of cases have adopted narrower interpretations of *Grey.* In situations where a petitioner simply attached his Appellate Division briefs to the application letter without discussing any specific claims, some courts have distinguished *Grey* and held that every issue discussed in the Appellate Division brief was fairly presented to the highest court of the state. *See, e.g., Natal v. Bennett,* No. 98 Civ. 1872,1998 WL 841480, at *4 (S.D.N.Y. Dec. 3, 1998); *Meatley v. Artuz,* 886 F.Supp. 1009, 1013–14 (E.D.N.Y.1995). Other courts have interpreted *Grey* based on a precise reading of its facts. For example, in *Melendez v. Scully,* No. CV–91–2497, 1993 WL 41769 (E.D.N.Y. Feb. 10, 1993), the petitioner's application letter discussed one claim in detail; with regard to other remaining claims, the application letter referred to briefs that had been submitted to the Appellate Division and were attached to the letter. *Id.* at *4. Noting that the petitioner in *Grey* had mentioned only one issue his application letter whereas the petitioner presently before it had incorporated claims by reference, the *Melendez* court concluded that it faced a situation

"quite different from *Grey.*" Specifically, the *Melendez* court found that "it is by no means obvious that [the one issue discussed in detail in the application letter] was the only point for which leave to appeal was sought," and decided that the other claims incorporated by reference had been fairly presented to the state courts. *Id.* at *4–*5; *see also Manning v. Artuz,* No. 94–CV–3325, 1996 WL 294359, at *4 (E.D.N.Y. May 29, 1996) (holding that when an application letter included a statement referring to the Appellate Division briefs, the claims in the briefs were fairly presented to highest state court, because "the fair import of this statement [was] that Petitioner was requesting the New York Court of Appeals to review the same claims that were advanced in the Appellate Division.")

■ Given the preferability of reviewing habeas petitions on the merits when such review would not offend principles of comity and federalism, I decline to adopt an expansive interpretation of the Second Circuit's holding in *Grey.* Instead, I adopt the reading suggested by *Melendez* and *Manning,* and find that the claims Morales' counsel incorporated by reference in her letter application were fairly presented to the Court of Appeals. Thus, Morales has exhausted his claims regarding the prosecutor making himself an unsworn witness, the impeachment of Mendez with his failure to come forward, the prosecutor's summation, and the sentencing.

■ With regard to Morales' jury instruction claim, respondent argues that this claim is unexhausted because the Court of Appeals was not alerted of its federal nature. In support of this argument, respondent relies on the letter application of Morales' counsel, which cited only state law in arguing the merits of the claim. However, the brief submitted to the Appellate Division contains prominent point headings which describe the trial court's refusal to provide a supplemental intoxication instruction as a violation of the Fourteenth Amendment of the United

States Constitution. Because I have already determined that the Appellate Division brief was incorporated into the letter application by reference, and thus that the claims asserted therein were properly presented to the Court of Appeals, I find that the invocation of the Fourteenth Amendment in the brief sufficiently alerted the state courts of the federal nature of Morales' jury instruction claim. *See Daye,* 696 F.2d at 192 ("[I]f the petitioner has cited the state courts to the specific provision of the Constitution relied on in his habeas petition, he will have fairly presented his legal basis to the state courts.").

### B. *Procedural Default*

■ Respondent next argues that this Court cannot reach the merits of any of the claims Morales raises in this habeas petition because, for two reasons, those claims are procedurally barred. First, respondent contends that the failure of Morales' letter application to present his claims to the New York Court of Appeals constitutes a procedural default, and that Morales has shown neither cause for this default nor prejudice resulting from a violation of federal law. (Respondent's Mem. at 6.) However, because I have already rejected respondent's argument that Morales did not fairly present his claims to the state courts, I reject this derivative argument as well.

Second, respondent contends that Morales' claims regarding the prosecutor becoming an unsworn witness, the impeachment of Mendez for his failure to come forward, and the prosecutor's summation are "barred from federal *habeas* review for the additional reason that under New York law, defendant waived appellate review of this claim by failing to make specific contemporaneous objections to the prosecutor's conduct." (Respondent's Mem. at 6–7.) Respondent relies on that portion of the Appellate Division's opinion in which, after addressing the supplemental jury charge and the length of Morales' sentence, the court stated that Morales' "remaining contentions are either unpreserved for appellate review or without merit." *People v. Morales,* 223 A.D.2d at 563, 636 N.Y.S.2d 384. According to respondent, "[u]nder these circumstances, the proper inference is that the Appellate Division rejected defendant's claim concerning the prosecutor's conduct at trial on the procedural ground of lack of preservation." (Respondent's Mem. at 7–8.)

In *Coleman v. Thompson,* 501 U.S. 722, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991), "the Supreme Court held that where a state prisoner has defaulted his federal claims in state court pursuant to an adequate and independent state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Id.* at 750, 111 S.Ct. 2546. However, "procedural default in the state court will only bar federal habeas review when 'the last state court rendering a judgment in the case clearly and expressly states that its judgment rests on a state procedural bar.'" *Glenn v. Bartlett,* 98 F.3d 721, 724 (2d Cir.1996) (quoting *Harris v. Reed,* 489 U.S. 255, 263, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989)), *cert. denied,* 520 U.S. 1108, 117 S.Ct. 1116, 137 L.Ed.2d 317 (1997).

Here, respondent apparently contends that when the Appellate Division stated that Morales' remaining claims were "either unpreserved for appellate review or without merit," the state court clearly and expressly relied on a procedural bar. This argument is without merit, as the Second Circuit addressed and rejected the precise contention in *Reid v. Senkowski,* 961 F.2d 374 (2d Cir.1992). In *Reid,* the state appellate court has summarily disposed of a petitioner's claim as "either unpreserved for appellate review or without merit." *Id.* at 377. Although the district court had found that this gave rise to a procedural bar, the Second Circuit disagreed, finding

that "[t]he state court did not clearly and expressly state whether it had examined the merits of the ... claim or had relied on a procedural default." *Id.* The Second Circuit thus held that the claim was "properly subject to federal habeas corpus review." *Id.* Accordingly, I find no default, and will proceed to the merits of each of Morales' claims.

## C. *The Merits of Morales' Claims*

### 1. *The Refusal to Provide a Supplemental Instruction on Intoxication*

■ "A jury charge in a state trial is normally a matter of state law and is not reviewable on federal habeas corpus absent a showing that the alleged errors were so serious as to deprive defendant of a federal constitutional right." *United States ex rel. Smith v. Montanye,* 505 F.2d 1355, 1359 (2d Cir.1974) (citing *Cupp v. Naughten,* 414 U.S. 141, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973)), *cert. denied,* 423 U.S. 856, 96 S.Ct. 106, 46 L.Ed.2d 81 (1975). As the Supreme Court stated in *Henderson v. Kibbe,* 431 U.S. 145, 97 S.Ct. 1730, 52 L.Ed.2d 203 (1977),

> The burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on direct appeal. The question in such a collateral proceeding is whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process, not merely whether the instruction is undesirable, erroneous, or even universally condemned.

*Id.* at 154, 97 S.Ct. 1730 (internal quotation marks and citations omitted).

■ Justice Gary's refusal to provide a supplemental instruction regarding intoxication was not even erroneous, let alone unconstitutional. The jury's note sought an explanation or definition of intent. It did not provide any indication that the jury

needed or wanted to be reinstructed on the issue of intoxication as it relates to intent.

■ In any event, even if the refusal to provide the supplemental instruction were error, Morales has not shouldered his burden of showing that the omission of the instruction "so infected the entire trial that the resulting conviction violated due process." As the Second Circuit has noted, "errors in [a] charge must be viewed in the context of the charge as a whole." *Roy v. Coxon,* 907 F.2d 385, 391 (2d Cir.1990). Here, Justice Gary had already instructed the jury on intoxication in his original charge; given that backdrop, the refusal to re-charge the jury on this issue does not rise to a violation of the right to a fair trial. This conclusion is further supported by the Second Circuit's holding in *Montanye.* There, the trial court had failed to provide *any* charge on intoxication or its possible effect on intent. 505 F.2d at 1359. However, the court of appeals found no constitutional error because "[d]efendant received a full and fair hearing and the trial judge's charge did not deprive defendant of his fundamental right to due process of law." *Id.* Having reviewed the trial proceedings, I find that Morales received a full and fair trial, and his claim regarding the intoxication charge is without merit.

### 2. *The Unsworn Witness Claim*

■ Morales' alleges as his second basis for habeas relief is that ADA Bugliosi himself an unsworn witness when he impeached defense Eric Mendez based on prior conversations between Mendez and prosecutors. In asserting that the references to prior conversations between Mendez and the District Attorney's office were improper, Morales appears to rely on—although he does not cite—the decision of the New York Court of Appeals in *People v. Paperno,* 54 N.Y.2d 294, 445 N.Y.S.2d 119, 429 N.E.2d 797 (1981). In *Paperno,* the Court of Appeals described the unsworn witness rule as follows:

> Th[e] rule has no definitive contours, but generally stands for the proposition that

the prosecutor may not inject his own credibility into the trial. Thus, we have reversed convictions where the prosecutor, to the prejudice of the defendant, has expressed his personal belief on matters which may influence the jury, has argued his own credibility on summation, has vouched for the credibility of the People's witnesses, or has, by cross-examination, suggested the existence of facts not in evidence. The primary rationale for so limiting the prosecutor's conduct is rooted in a concern that the criminal process be fair. Such conduct on the part of the prosecutor amounts to a subtle form of testimony against the defendant, as to which the defendant may have no effective means of cross-examination. Hence, the rule is founded upon the possible danger that the jury, impressed by the prestige of the office of the District Attorney, will accord great weight to the beliefs and opinions of the prosecutor.

*Id.* at 301, 445 N.Y.S.2d 119, 429 N.E.2d 797.

As described above, there were two instances during cross-examination when the prosecutor attempted to impeach Mendez based on prior conversations between Mendez and ADAs. In one instance, ADA Bugliosi challenged Mendez's statement that Morales' mother had never "begged" him to testify on Morales' behalf. (Tr. 468.) When Bugliosi asked whether Mendez had used the word "beg" in a conversation with Bugliosi the night before, Mendez stated that Morales' mother had asked him to "please help her son, please," but suggested that he never told Bugliosi that Morales' mother had "begged" him to testify. Bugliosi did not inquire further into the matter. In the second instance, Bugliosi relied on a prior conversation between Mendez and another ADA in order to challenge Mendez's testimony that he saw the profile of the actual perpetrator. (Tr. 480–81.) Mendez responded by stating that he had told ADA Reeves that he could recognize the perpetrator. (*Id.*) Again, Bugliosi did not inquire further. (*Id.*)

It was unwise of ADA Bugliosi to have had a conversation with a witness without a third party on the line. By doing so, he made it impossible to use the conversation in his subsequent examination of Mendez without injecting his own credibility into the trial. When Bugliosi questioned Mendez about his prior description of Morales' mother's effort to get Mendez to testify, Bugliosi was indirectly telling the jury that Mendez told him that she had "begged." Bugliosi thus became—indeed, he made himself—an unsworn witness to a relevant out-of-court conversation, and failed to blunt the problem that created by ensuring that someone besides himself (a detective, a paralegal, even another ADA) was available to provide the People's version of it. To that limited extent, Bugliosi was, in effect, an unsworn witness.[10]

However, such trial errors are reviewed under the harmless error standard of *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), pursuant to which this Court's inquiry is whether the error "had substantial and injurious effect or influence in determining the jury's verdict." 328 U.S. at 776, 66 S.Ct. 1239; *see also Nimmons v. Walker,* No. 92 Civ. 5782, 1995 WL 373446, at *3 (S.D.N.Y. June 21, 1995). "Under this standard, habeas petitioners may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'" *Brecht v. Abrahamson,* 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993).

Here, the references to Mendez's prior conversation with the ADA was fleeting, and the subject matter of the communication was neither significant nor the subject of real disagreement. Moreover, the jury

---

**10.** The reference by Bugliosi to Mendez's conversation with ADA Reeves did not pose the unsworn witness problem, because Reeves was not a prosecutor at trial.

was presented with strong evidence of Morales' guilt, including testimony that he had been waving a gun outside the bodega, that he and Martinez were arguing immediately before Martinez was shot, that he threatened to shoot Adolfo Ruiz after Ruiz confronted Morales, and that he made a tossing motion into an area from which police recovered the weapon that had been used to fire the fatal shot. In view of such evidence, to the extent Bugliosi violated the unsworn witness rule, I do not find that such an error had a substantial and injurious effect on the verdict.

### 3. *The Impeachment of Mendez for Failing to Come Forward Promptly After the Shooting*

█ During cross-examination, ADA Bugliosi asked Mendez how long it took him to remember that someone other than Morales had committed the shooting, and Mendez answered that he had always remembered but did not want to come forward. (Tr. 470.) When Bugliosi next asked why Mendez had not come forward, Mendez testified that "where we live, you don't really get involved in murder cases." (*Id.*) Defense counsel objected to two further questions from ADA Bugliosi on this subject, and the objections were sustained. (*Id.*) According to Morales, this line of cross-examination violated his right to a fair trial.

I find nothing improper about this aspect of the cross-examination of Mendez. The Second Circuit addressed a similar situation in *United States v. Carr*, 584 F.2d 612 (2d Cir.1978), *cert. denied*, 440 U.S. 935, 99 S.Ct. 1280, 59 L.Ed.2d 494 (1979), in response to a habeas petitioner's claim that it was improper for the government to impeach a defense witness by eliciting that he had remained silent for a nineteen-month period prior to trial. *Id.* at 617. The Second Circuit found no error, stating that under the circumstances, the witness' silence was possibly inconsistent with his willingness to testify, and thus was relevant to the witness' credibility. *Id.* at 618.

Even assuming that there was any error in this cross-examination, Morales has again failed to establish any actual prejudice resulting therefrom.

### 4. *The Prosecutor's Comments on Summation*

█ In *Donnelly v. DeChristoforo*, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974), the Supreme Court indicated that prosecutorial remarks on summation rise to the level of a constitutional violation only when such remarks "make [petitioner's] trial so fundamentally unfair as to deny him due process." *Id.* at 645, 94 S.Ct. 1868; *see also Garofolo v. Coomb*, 804 F.2d 201, 206 (2d Cir.1986) ("*Donnelly* ... indicates that constitutional error occurs only when the prosecutorial remarks were so prejudicial that they rendered the trial in question fundamentally unfair.") Thus, "[a] criminal conviction will not be overturned on the basis of a prosecutor's remarks in an otherwise fair proceeding." *Gatto v. Hoke*, 809 F.Supp. 1030, 1040 (E.D.N.Y.), *aff'd*, 986 F.2d 500 (2d Cir. 1992). Instead, "[p]rosecutorial misconduct during summation is grounds for reversal only when the remarks caused substantial prejudice to the defendant." *Gonzalez v. Sullivan*, 934 F.2d 419, 424 (2d Cir.1991) (internal quotation marks omitted). The factors a Court must consider in assessing whether a petitioner has met this standard include the prejudicial ramifications of the misconduct, the measures adopted by the trial court to cure the misconduct, and the certainty of conviction absent the prejudicial conduct. *See id.*

Here, in support of his claim that remarks on summation undermined the fairness of his trial, Morales points to Bulgiosi's statements that (1) he had a conversation with Mendez the night before the trial in which Mendez said he could not identify the actual perpetrator (Tr. 556), and (2) Mendez had waited approximately one year before testifying. (*Id.* at 559.) Morales also focuses on var-

ious points during summation at which Bugliosi accused Mendez of giving false testimony. According to Morales, "argument by name-calling, particularly referring to defense witnesses as liars, exceeds the bounds of legitimate advocacy." (Petitioner's Memorandum of Law at 14–15.)

I find that Bugliosi's comments on summation did not make Morales' trial so fundamentally unfair as to deny him due process. Much of what Mendez challenges was permissible argument. Mendez had been properly impeached on cross-examination regarding his failure to come forward promptly, and Bugliosi was within the bounds of proper summation in using that fact to attack his credibility. As for Bulgiosi's statements or suggestions that Mendez was a liar, the rule in this circuit is that "[u]se of the words 'liar' and 'lie' to characterize disputed testimony when the witness's credibility is clearly in issue is ordinarily not improper unless such use is excessive or is likely to be inflammatory." *United States v. Peterson,* 808 F.2d 969, 977 (2d Cir.1987). Having reviewed the entirety of the record, I conclude that Bugliosi's use of these words was neither excessive nor inflammatory.

The reference to the telephone conversation in which Mendez was asked if he could recognize the man Mendez claimed was the shooter is slightly more troublesome. On cross-examination, Mendez had denied that he told ADA Reeves that Mendez could not identify the "real" killer. (Tr. 480–81.) A review of the testimony suggests that this subject was not discussed in the separate conversation between Mendez and ADA Bugliosi. (*Id.*) Nonetheless, by arguing in his summation that he was surprised by Mendez's testimony that he could identify the shooter, "since I had had a conversation with him the night before," (*id.* at 566), Bugliosi suggested to the jury that Mendez had stated otherwise to Bugliosi. This again made Bugliosi an unsworn witness.

The degree of harm caused by this error was blunted in three ways. First, the jury had good reason to conclude that Bugliosi had no basis to be surprised by Mendez's testimony, as the testimony revealed that Mendez's ability to identify the killer was not in fact discussed with Bugliosi. Second, both before and after summation, Justice Gary issued standard instructions informing the jury that lawyers' arguments are not evidence and are to be disregarded to the extent they are illogical or unsupported by the evidence. (*Id.* at 509–510, 576–77.) Third, and most important, the evidence against Morales was overwhelming, and I cannot conclude that the isolated remarks about Mendez's telephone interviews with the prosecutors had a substantial injurious effect on the verdict. Thus, while it was error for Bugliosi to make himself an unsworn witness during summation, that error does not rise to the level of misconduct warranting habeas relief.

*5. Sentencing*

It is well-settled that "[n]o federal constitutional issue is presented where . . . the sentence is within the range prescribed by state law." *White v. Keane,* 969 F.2d 1381, 1383 (2d Cir.1992); *accord Dorsey v. Irvin,* 56 F.3d 425, 427 (2d Cir.1995). The sole exception to this rule is that due process is violated when an enhanced sentence is "motivated by actual vindictiveness toward the defendant for having exercised guaranteed rights." *Wasman v. United States,* 468 U.S. 559, 568, 104 S.Ct. 3217, 82 L.Ed.2d 424 (1984).

Morales' sentence for Manslaughter in the First Degree was within the range provided for by the terms of New York Penal Law. *See* N.Y.Penal Law § 125.20; *id.* § 70.00(2)–(3). Justice Gary's statement that "the jury has already shown [Morales] mercy," (Sent. Tr. at 7), does not indicate that Morales received the maximum sentence in retaliation for the exercise of his right to a jury trial, or as a result of any other constitutionally impermissible motivation. Ac-

381

cordingly, Morales' sentencing claim is meritless.

*CONCLUSION*

For the reasons set forth above, Morales' petition for a writ of habeas corpus is denied. In addition, I refuse to issue a certificate of appealability, because petitioner has not presented a "substantial showing of the denial of a constitutional right." *See Reyes v. Keane*, 90 F.3d 676, 680 (2d Cir.1996) (quoting Section 102 of the AEDPA).

So Ordered.