**Richard Bernard LYON, Petitioner,**

v.

**Daniel A. SENKOWSKI, Superintendent, Clinton Correctional Facility, Respondent**

No. 99–CV–6206(L)B.

United States District Court,
W.D. New York.

Aug. 7, 2000.

Richard Bernard Lyon, Dannemora, NY, pro se.

Brooks T. Baker, Steuben County Attorney, John C. Tunney, Steuben Co. District Attorney, Bath, NY, for Daniel Senkowski, defendants.

## DECISION AND ORDER

LARIMER, Chief Judge.

### *INTRODUCTION*

Petitioner Richard Bernard Lyon[1] was convicted in New York State Supreme Court, Steuben County, of two counts of murder, second degree, and single counts of burglary, first degree, burglary, third degree and petit larceny. He received two consecutive sentences of twenty five years to life. Lyon has filed a habeas Petition under 28 U.S.C. § 2254, challenging his conviction and sentence. (Item no. 1.) The Steuben County District Attorney, appearing on behalf of Respondent, argues that the Petition must be dismissed since it includes unexhausted claims; that Lyon procedurally defaulted on a number of claims; and that none of the claims has merit. (Items no. 9, 10.) Lyon submitted a Reply that contests each defense. (Item no. 13.)

Now, upon review of the parties' submissions, and upon consideration of the issues presented herein and applicable law, Petitioner's Petition is denied and this action is dismissed, for the following reasons.

### BACKGROUND

Robert J. Wills and his wife Dorothy Wills lived in Wayne, New York, and ran an antique shop in a carriage house adjacent to their home. On June 15, 1980, Mr. and Mrs. Wills were found dead in their home. Both victims had been shot twice in the head with a .22 caliber pistol. Mr. Wills had a fractured skull and lacerations to the side of his skull in addition to the bullet wounds. Mrs. Wills also had head wounds and an electrical cord was wrapped around her neck. (C373–74, 425–34.)[2]

The crime went unsolved until November, 1981, when Sidney Wright, through an attorney, informed police that he had information regarding the homicides. Wright was in custody in Georgia on robbery and kidnaping charges. He negotiated a deal in which he was permitted to plead guilty to burglary for his involvement in the Wills crime, if he cooperated with the investigation and prosecution. The agreement also provided that Wright be sentenced to 7½ to 15 years on the burglary conviction, to run concurrent with his Georgia sentence, and that he would be permitted to serve the concurrent sentences in New York rather than Georgia. (C70–74, 545–55.)

Wright told police and later testified that he committed a prior burglary with John Wayne Ross, and that Ross introduced him to Lyon. Lyon knew the Willses' son and was aware that they collected antique dolls. Lyon suggested that he, Wright and Ross burglarize the Willses' antique shop. The three men drove to the shop to scout the location. Lyon stopped at a tavern on the way to get directions. (H10–25, C561–63.)

The next night, Ross and Wright drove in one car and Lyon drove in his own car, a blue Lincoln Continental. When they got near the antique shop, Lyon told Ross and Wright to wait and drove further up the road. About an hour later, Lyon returned and they parked at a distance from the shop. Lyon and Wright walked through a wooded area to the shop. Wright entered through a window while Lyon waited outside. When Wright was unable to locate any dolls in the antique shop, they decided to burglarize the Willses' home. (H25–37.)

Lyon took a hatchet that Wright had found in the shop and went to the door of the house. Wright heard a door open then "heard a muffled sound like someone had

---

**1.** At trial, the Petitioner was identified as Richard *Lyons*. However, Petitioner calls himself Richard Bernard *Lyon* in his Petition and other submissions to this Court, and this Court will use the latter appellation.

**2.** The trial record includes separately numbered transcripts prepared by two different court reporters. References to the transcript prepared by Michael J. Colopietro are cited as "C" followed by page numbers. References to the transcript prepared by Donna M. Harrington are cited as "H" followed by page numbers.

been hit." He went to the door and saw an old man "stooped over." Lyon hit the man in the head with the hatchet. The man called a woman's name. Lyon went into another room. An old lady came into the other room, and Lyon hit her with the hatchet. Lyon walked back to the old man, who was trying to stand up, and shot him twice. Then he returned to the old lady and pulled a cord around her neck. Wright searched the house for dolls, finding a few. He heard two more shots. They left the house together and walked back to the cars. Wright and Ross drove away as Lyon was getting into his car. (H37–44, 127–54.)

Although Wright was the prosecution's only eyewitness, a number of other witnesses corroborated parts of his story. Reginald Wills, the victims' son, testified that he and Lyon had been schoolmates, that Lyon had visited the Willses' home a number of times, that his parents collected antique dolls, and that he saw a number of the dolls in his parents' home the Sunday before the murders. (H445–49.)

Wallace Gary Williams, an antique dealer, testified that Ross introduced him to Lyon the week before the murders, that Lyon asked what antique dolls were worth, and Williams said that he would have to see the dolls to give an estimate. The day after the murders, Ross sold Williams a small German doll and a toy train. (H377–83.)

John Gary, who worked at a tavern near Wayne, testified that Lyon entered his establishment the night before the murders and asked for directions to an antique shop, which Gary "believe[d]" was Wills' Antiques. (H364–65.) Gary stated that Lyon was driving a light colored Lincoln Continental. (H366–67.) John Bierwiler testified that he had sold Lyon a blue Lincoln Continental in March, 1980. (H375.)

Lyon's defense at trial was that Wright committed the murders, and he attempted to shift the blame to Lyon. Lyon called two witnesses, Jean Gilliam and George Wil-

son, who testified that they heard Wright say that he murdered the Willses. (H491, 525–27.) Lyon also called Ross, who testified that Lyon was not in the Willses' house at the time of the murders, and that Wright admitted killing the Willses and then urged Ross to blame the murders on Lyon. (H563–66, 573–77, 582.) However, Ross also testified that Lyon planned the burglary in order to steal antique dolls, that Lyon waited in his car in the vicinity of the antique shop during the burglary, that he met Lyon later that night and told him about the murders, and that Lyon then told him to "get [Wright] out of here." (C576, 598–602, 607.) Ross also admitted that, when he was first questioned by the police, he implicated Lyon in the murders. (C590–92, 629–32.)

During cross-examination of Wright and of Bernard Marro, the police investigator who took Wright's statement, Lyon's counsel brought out the fact that Wright did not come forward until after he was arrested in Georgia, and that Wright's deal enabled him to escape his Georgia prison sentence and to avoid murder charges for his role in the Willses' deaths. Counsel also brought out the fact that Wright initially told Marro that he drove away before the murders occurred, leaving Lyon at the scene of the crime. (H197–264, C544–48, 568–72.)

In his summation, Lyon's counsel argued that Wright made up the story about Lyon's involvement in order to get out of his Georgia sentence and to avoid a murder charge in New York. Counsel stressed the fact that Wright did not come forward until his Georgia arrest, the favorable terms of the plea agreement, Wright's attempt to convince Ross to blame Lyon for the murders, his alleged admissions to Gilliam and Wilson that he killed the Willses, and his initial statement to Marro that he drove away before the murders. (C826–28, 834–44.) Counsel also argued that Marro destroyed notes from his initial interview with Wright, contending that

"those things that ... fit Mr. Wright's story, ... were kept. Those things that did not found their way to a paper shredder and were destroyed." (C838.)

Near the conclusion of defense counsel's summation, Reginald Wills, who was seated in the gallery, stood and shouted to the jury: "[w]hy not put Richard Lyons on the stand." (C869.) Wills made a number of other comments that were not recorded by the court reporter before he was escorted out of the courtroom by police. (C870.) Defense counsel moved for a mistrial on the ground that Wills, the victims' son, essentially told the jury that they should infer Lyon's guilt from the fact that he did not testify. (C871–72.) Counsel also adverted to Wills' "threat of someone having to pay for this homicide." (C872.) The prosecutor opposed the motion, noting that the outburst was not attributable to prosecutorial misconduct and that the court could cure any prejudice by a cautionary instruction to the jury. (C872–73.)

The judge declared that he planned to voir dire the jurors to ascertain whether the outburst affected their ability to decide the case impartially. (C873.) After a recess during which defense counsel met with Lyon, counsel gave the judge a number of suggestions for his voir dire of the jurors. (C874–75.) Counsel also stated that Lyon waived his right to be present "during this process." (C874.) The judge then spoke with each juror in chambers, in the presence of the prosecutor and defense counsel. The judge asked each juror what he or she had heard, and whether Wills' statements would affect their objectivity. He emphasized that sympathy for the victims must not affect their deliberations, and that they must not draw any inference from the fact that Lyon did not testify. (C877–912.)

With one exception, jurors stated that they could follow the judge's instructions and that Reginald Wills' outburst did not bias their opinion regarding Lyon's guilt or innocence. (C878, 882, 888, 891, 893, 895–96, 899, 902, 904, 907–08, 909.) However, juror number 3 initially stated that, "there is a question in my mind now.... I feel that its very unfortunate what has happened, but what is instilled there, I don't know. I can't honestly say." (C883–84.) Asked if the incident "might have some impact on your duties as a juror," he replied, "I'm not sure if it would, but to be very honest, I'm not sure that it wouldn't," and added, "maybe if I had a little more time, I would be able to evaluate it better." (C884–85.) The judge suggested that juror number 3 ponder the question during voir dire of other jurors. (C886.) Following his questioning of the other jurors, the judge again asked juror number 3 if he felt he "could set aside any of the occurrences in there and decide [the case] strictly on the evidence[.]" The juror replied, "I believe so now," and stated that he would not focus on the fact that Lyon did not testify or let sympathy for the family affect his judgment. (C913.) The judge denied Lyon's mistrial motion. (C913–14.)

The prosecutor then delivered his summation. Referring to the defense contention that Marro destroyed interview notes, the prosecutor stated:

> if you believe that he destroyed intentionally what could have been material evidence for you, he came in here and lied to you for two days. ... It didn't happen, not in this case, not with that policeman.

(C922–23.)

In his jury charge, the trial judge stressed that sympathy for the victims and their family must not affect the jury's deliberations (C950), and that

> the fact that the defendant did not testify may in no way be used against him, because the prosecution always has the burden of proof. The defendant is under no obligation to prove anything by ·offering his testimony and may not be compelled to do so.... [I]t is a requirement of our constitution that you may draw no inference unfavorable to the

defendant because he has not testified in this case.

(C969–70.) The judge also stressed that the prosecution bore the burden of proving intent beyond a reasonable doubt (C959), stating that intent

is not always easy to establish and depends upon the particular circumstances of the case, including the actions of a person.... You may, but you are not required to do so, after careful consideration of all of the facts and circumstances in the case, infer criminal intent from the natural and ordinary consequences of a person's acts. However, the fact that you may infer any such unlawful intent does not shift any burden of proof whatsoever. The burden of proof as to each element of the crime submitted to you remains upon the People.

(C960–61.)

The jury found Lyon guilty of larceny, first and third degree burglary, and felony murder on both counts. However, it found Lyon not guilty of both counts of intentional murder and of conspiracy. (C1177–79.) In other words, the jury found that Lyon participated in a felony in which he or another participant caused the death of Mr. Wills and Mrs. Wills. However, it did not specifically find that Lyon was the individual who actually killed the Willses. (*Id. See also* Indictment, Ex. A.)

For the murder of Robert Wills, Lyon was sentenced to twenty-five years to life, concurrent with lesser sentences on the larceny and burglary convictions. (*People v. Lyon*, Sentencing, at 9.) For the murder of Mrs. Wills, Lyon was given a twenty-five year to life sentence, consecutive "to all other terms imposed." (Id., at 11.)

In Lyon's direct appeal, his attorney submitted a brief that raised claims corresponding to the First through Fifth Claims in the present Petition. (Ex. B.) Lyon submitted a *pro se* Supplemental Brief, raising claims equivalent to the Sixth through Twelfth Claims. (Ex. D.) The Appellate Division affirmed the conviction and sentence. *People v. Lyon*, 134 A.D.2d 909, 521 N.Y.S.2d 930 (4th Dept.1987).

Lyon's counsel submitted a request for permission to appeal to the New York Court of Appeals, raising the First and Fifth Claims in the present Petition. (Ex. G.) In response to an inquiry by Lyon, the Court of Appeals sent him a letter indicating that "a copy of [Lyon's] *pro se* Supplemental Brief was included in the papers." (Item no. 13, Ex. B.) The Court of Appeals denied Lyon's application for permission to appeal. *People v. Lyon*, 71 N.Y.2d 970, 529 N.Y.S.2d 82, 524 N.E.2d 436 (1988).

Lyon subsequently filed a post-trial motion pursuant to New York Criminal Procedure Law (CPL) § 440, raising claims corresponding to the Thirteenth through Sixteenth Claims in the present Petition. (Ex. I.) In a Decision denying the motion, the state court held that the basis for Lyon's Thirteenth Claim "is a matter of record and should have been subject for Appellate review," and denied the other three claims on the merits. (Ex. K.) Lyon then requested permission to appeal the CPL § 440 motion, reiterating all of the claims in that motion. (Ex. L.) The request was denied. (Ex. M.) [3]

## DISCUSSION

### I. JURISDICTIONAL ISSUES

#### A. Exhaustion of State Judicial Remedies

 The habeas statute provides:

[a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State

---

3. In his petition and Reply, Lyon adverts to two additional state court proceedings, a habeas corpus proceeding and a Writ of Error Coram Nobis. (Item no. 1 ¶ 11, Item no. 13 ¶¶ 2, 6, 11.) Lyon's description of those pro-

ceedings is quite vague. It appears that the state courts did not dispose of any of Lyon's present habeas claims on the merits in either the habeas or Coram Nobis proceeding.

court shall not be granted unless it appears that the applicant has exhausted the remedies available in the courts of the state.

28 U.S.C. § 2254(b)(1)(A). A habeas petitioner "must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999). Typically, this means that Federal habeas claims must have been included in both the petitioner's appeal to the state's intermediate appellate court and in an application for permission to appeal to the state's highest court. *Boerckel*, at 848, 119 S.Ct. at 1734.

Respondent contends that Lyon only raised two claims before the New York Court of Appeals, and that his other habeas claims were not properly exhausted. (Item no 9 ¶ 4.) The application that Lyon's appellate counsel submitted to the Court of Appeals only included two claims. However, the Court of Appeals acknowledged that it also received a copy of Lyon's *pro se* Brief to the Appellate Division.

■ To properly exhaust a claim, "the petitioner must have informed the state court of both the factual and legal premises of the claim he asserts in federal court," and must have "alert[ed] the [state] court to the claim's federal nature." *Daye v. Attorney General of New York*, 696 F.2d 186, 192–93 (2d Cir.1982) (citing, *inter alia, Picard v. Connor*, 404 U.S. 270, 278, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971)). Lyon's *pro se* brief sets forth the factual and legal premises of his claims. There-

fore, the claims in Lyon's *pro se* brief, which was submitted to the Court of Appeals, have been adequately exhausted. *Morgan v. Bennett*, 204 F.3d 360, 369–71 (2d Cir.2000).[4]

■ Although a "complete round" of the state's review process typically involves a defendant's direct appeal, state law can provide an alternate avenue for relief. New York law permits assertion of certain claims in a post-trial motion to vacate the judgment rather than on direct appeal. CPL § 440. Lyon filed a post-trial motion under CPL § 440, raising a number of claims. Three of those claims were denied on the merits. Lyon unsuccessfully sought permission to appeal the denial of those three claims. By raising those claims in his post-trial motion under CPL § 440 and then appealing the denial of the claims, Lyon invoked a "complete round" of the "available" state procedure and properly exhausted his judicial remedies with regard to those claims.

This court therefore holds that Lyon properly exhausted his First, Fifth, Sixth Seventh, Eighth, Ninth, Tenth, Eleventh and Twelfth Claims on direct appeal, and his Fourteenth, Fifteenth and Sixteenth claims in his § 440 Motion.

■ Lyon failed to properly exhaust judicial remedies with regard to the remainder of his habeas claims. The Second, Third and Fourth Claims, although raised on direct appeal in counsel's Brief to the Appellate Division, were not presented to the Court of Appeals, and therefore were not adequately exhausted, as required by *Boerckel*.

---

4. In *Grey v. Hoke*, 933 F.2d 117 (2d Cir.1991), a defendant's lower court *pro se* brief was submitted to the New York Court of Appeals, together with a cover letter calling the court's attention to one claim in that brief. The Second Circuit held that this submission did not exhaust all of the claims in the *pro se* brief, reasoning that the state court had no "duty to look for a needle in a paper haystack." *Id.* at 120. In *Morgan*, the Second Circuit distinguished *Grey*, since Morgan

wrote a letter alerting the New York Court of Appeals to the issues that he wanted to raise. In the present case, correspondence between Lyon and the Court of Appeals suggests that the court was apprized of Lyon's intention to raise all the issues in his *pro se* brief. Thus, this case is procedurally similar to *Morgan*, and not to *Grey. See Natal v. Bennett*, 1998 WL 841480, *4 (S.D.N.Y.1998); *Morales v. Miller*, 41 F.Supp.2d 364, 375 (E.D.N.Y.1999) (collecting cases.)

Lyon raised his Thirteenth Claim in his § 440 motion; however, the court dismissed that claim on the ground that it should have been raised on direct appeal. Lyon's Seventeenth Claim, that he was denied a hearing on his § 440 motion, could not have been brought on direct appeal since it involves a post-trial matter. However, Lyon failed to include that claim in his application for permission to appeal the § 440 motion. Therefore, Lyon failed to exhaust his Thirteenth and Seventeenth Claims.

Claims Nineteen through Twenty-five were not raised in Lyon's appeal or in his § 440 motion, and are unexhausted. Lyon's Twenty-sixth Claim asserts that he was denied due process because of the "cumulative effect" of numerous errors by the trial court, prosecutorial improprieties and ineffective assistance of defense counsel. (Pet.¶ 12(Z).) Lyon raised a version of this "cumulative effect" claim in his *pro se* brief on direct appeal (Ex. D, at 21–28); however, the various grounds upon which he based that claim do not correspond to the grounds that form the basis of the claim in the present Petition. Since Lyon did not give state courts a "fair opportunity" to address his Twenty Sixth Claim, it is unexhausted. *Daye*, 696 F.2d at 192.

Lyon's Eighteenth Claim asserts that he was denied effective assistance of counsel both at trial and in his appeal. (Pet. § 12(R).) Although his CPL § 440 motion raised the claim of ineffective assistance of trial counsel, Lyons did not raise his claim of ineffective assistance of appellate counsel. Therefore, Lyon's Eighteenth Claim has not been "properly presented" to state courts, and is unexhausted. *Id.*

To summarize, Lyons exhausted the following claims: First, Fifth, Sixth through Twelfth, Fourteenth, Fifteenth and Sixteenth. He failed to exhaust the following

claims: Second, Third, Fourth, Thirteenth, and Seventeenth through Twenty-sixth.[5]

## B. Procedural Default

A state court decision resting on "an adequate foundation" of state law is "immune from review in the federal courts." *Wainwright v. Sykes*, 433 U.S. 72, 81, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). When a state court has declined to address a claim on the ground that the defendant procedurally defaulted, for example by a failing to object at trial, that ruling is an independent and adequate state ground. *Id.* at 90, 97 S.Ct. 2497. A federal habeas court may address such a claim only if the petitioner can show "cause for the default, and actual prejudice as a result of the alleged violation of federal law," or that "failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991).

Failure to include a claim on appeal is a type of procedural default. *Murray v. Carrier*, 477 U.S. 478, 489, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986). In Lyon's CPL § 440 motion, the state court dismissed a claim corresponding to the Thirteenth Claim on the ground that it should have been raised on appeal. (Ex. K, at 2.) Lyon procedurally defaulted on that claim. Since he has not shown cause and prejudice or a miscarriage of justice, Lyon's Thirteenth Claim must be dismissed.

The doctrine of procedural default has historically been invoked when a state court expressly relied on a state procedural ground in dismissing a claim. In *Boerckel*, the Supreme Court held that procedural default applies when a "state court remedy ... is no longer available," regardless of whether a state court ex-

---

**5.** Although Lyon's submissions do not permit this Court to discern the precise outcome of his state habeas or Coram Nobis proceedings, it is clear that those proceedings did not im-

plicate a "complete round" of New York's "established review process" as required by *Boerckel*.

pressly relied on the default. 526 U.S. at 848, 119 S.Ct. 1728. The petitioner in *Boerckel* did not include all his claims in his request for permission to appeal to Illinois' highest court. The Supreme Court held that the claims were not properly exhausted, and also that

> this state court remedy—a petition for leave to appeal to the Illinois Supreme Court—is no longer available to Boerckel; the time for filing such a petition has long past [sic]. Thus, Boerckel's failure to present three of his federal habeas claims to the Illinois Supreme Court in a timely fashion has resulted in a procedural default of those claims.

*Id.* at 848, 119 S.Ct. 1728. (Internal citation omitted.)

██ Under New York law, if a defendant could have raised a claim on direct appeal and failed to do so, the claim may not be raised in a post-conviction motion. CPL § 440(2)(c). Also, if a defendant "was in a position" to raise a claim in a post-conviction motion but failed to do so, the claim cannot be raised in a successive motion. CPL § 440(3)(c). Lyon raised his Second, Third and Fourth claims on appeal to the Appellate Division, and clearly could have raised them to the Court of Appeals. Those claims are therefore procedurally barred by CPL § 440(2)(c). It is clear from the trial record that Lyon could have raised his Nineteenth, Twentieth, Twenty-first, Twenty-second, Twenty-fifth and Twenty-sixth claims in his direct appeal. His failure to include those claims in his appeal is a procedural default under CPL § 440(2)(c). Lyon could have raised his Eighteenth, Twenty-third and Twenty-fourth Claims, which assert ineffective assistance of counsel, in a post-trial motion. His failure to include those claims in his CPL § 440 motion is a procedural default under CPL § 440(3)(c). Further, Lyon's failure to appeal the alleged improper denial of a hearing on the CPL § 440 motion is a default of his Seventeenth Claim.

██ Lyon has not shown cause for defaulting on any of these claims. Nor has he shown prejudice from violations alleged in those claims. Lyon's Second Claim, which is based on a New York statute that requires corroboration of accomplices' testimony does not implicate a Federal right. The Third, Fourth, Nineteenth, Twentieth and Twenty-first claims involve discretionary decisions of the trial judge that did not implicate a Federal right and had no impact on the outcome of the trial. There is no basis for Lyon's Twenty-second Claim, that he was denied a pre-trial hearing on Wright's inconsistent statements; Due Process requires no such hearing. Lyon's Twenty-sixth claim is a laundry list of alleged violations. There is no basis for finding that any element of this claim violated Lyon's Constitutional rights, much less that the alleged violations affected the outcome of the trial in any way individually or collectively.

██ The Twenty-third and Twenty-fourth claims, which allege ineffective assistance of trial counsel are unfounded. Contrary to Lyon's allegation, his attorney pursued the statutory defense to felony murder defined in New York Penal Law § 125.12(3). The jury reasonably rejected that defense. Also, counsel had no basis for seeking admission of witnesses' prior statements as exhibits; under New York law, such statements can only be used for impeachment. Lyon also has not shown prejudice from the appellate counsel component of his Eighteenth Claim, in that there is no indication that appellate counsel failed to raise any meritorious claim.

██ Lyon also has failed to demonstrate that dismissal of any of his defaulted claims would result in a miscarriage of justice. A miscarriage of justice occurs "in an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray*, 477 U.S. at 496, 106 S.Ct. 2639. The abundant evidence in support of the jury's verdict precludes such a showing.

Lyon procedurally defaulted on his Second, Third, Fourth, Thirteenth and Seventeenth through Twenty-sixth Claims. He has not shown cause and prejudice or miscarriage of justice, and is barred from raising them in this proceeding. Although this Court does not reach the merits of Lyon's defaulted claims, it notes that they would in any event be subject to dismissal under 28 U.S.C. § 2254(b)(2), which provides that "[a]n application for a writ of habeas corpus may be denied on the merits notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the state."

### C. "Mixed" Petitions: *Rose v. Lundy*

■ In *Rose v. Lundy,* 455 U.S. 509, 522, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982), the Supreme Court held that a district court must dismiss a habeas petition containing both exhausted and unexhausted claims. The Court reasoned that such a "total exhaustion rule," while not expressly required by the habeas statute, best promotes the ends of that statute, consistent with states' interest in the integrity of their judicial proceedings. *Id.* at 521, 102 S.Ct. 1198.

Respondent argues that Lyon's Petition must be dismissed since it includes both exhausted and unexhausted claims. While it is true that Lyon did not properly exhaust state judicial remedies with regard to a number of his claims, they are not "unexhausted" claims under *Rose v. Lundy.* "The exhaustion doctrine ... turns on an inquiry into what procedures are 'available' under state law," *Boerckel,* 526 U.S. at 848, 119 S.Ct. 1728. Thus,

> [g]enerally, if a federal habeas petition contains unexhausted claims, a federal court should dismiss it. [citing *Rose v. Lundy* ]. However, if the petitioner no longer has "remedies available" in the state courts under 28 U.S.C. § 2254(b), we deem the claims exhausted.

*Bossett v. Walker,* 41 F.3d 825, 828 (2d Cir.1994). *See also Reyes v. Keane,* 118 F.3d 136, 139 (2d Cir.1997). Since Lyon no longer has an available state court forum in which to raise his claims, his Petition is not subject to dismissal as a "mixed" petition under *Rose v. Lundy.*

## II. EXHAUSTED CLAIMS

### A. Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 significantly amended the habeas corpus statute. The statute now provides that a § 2254 habeas

> shall not be granted with respect to any claim that was adjudicated on the merits in State court unless the adjudication of the claim—— (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(D)(1–2). Further, "a determination of a factual issue made by a State court shall be presumed correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). I examine each of Lyon's claims under these standards.

### B. Juror Prejudice from Reginald Wills's "Outburst"

■ Lyon claims that he was denied a fair trial "due to jury prejudice caused by the in-court outburst" of the victims' son, Reginald Wills. (Pet.¶ 12(A.)) In Lyon's direct appeal, the Appellate Division held:

> [t]he trial court after this outburst conducted a voir dire of the individual jurors, with both counsel present and assisting in the inquiry, and was assured that they could render an impartial verdict. ... As the trial court determined that there was no prejudice resulting from this outburst, it properly denied defendant's motion for a mistrial.

*People v. Lyon*, 134 A.D.2d at 910, 521 N.Y.S.2d 930. (Internal citations omitted.)

The impact of Reginald Wills's outburst on jurors' ability to render an impartial verdict is a "question[ ] of historical fact" which "must be determined, in the first instance, by state courts and deferred to, in the absence of convincing evidence to the contrary, by the federal courts." *Rushen v. Spain*, 464 U.S. 114, 120, 104 S.Ct. 453, 78 L.Ed.2d 267 (1983). (Internal citation omitted.) After polling the jurors, the trial judge determined that they were able to render an unbiased verdict. One juror initially expressed reservations. However, after taking time to consider whether he could decide the case impartially, the juror informed the judge that he could do so. Thus, the juror's initial expression of doubt, rather than suggesting bias, reflects that he made a conscientious effort to assess the effect of the outburst on his objectivity. The trial judge's finding that each juror could render an unbiased verdict was upheld on direct appeal and there is no compelling contrary evidence. This Court must defer to that finding. Lyon's First Claim must therefore be dismissed.

Lyon also claims that he was improperly excluded from the trial judge's interviews of the jurors. (Pet.¶ 12(I).) "The right to personal presence at all critical stages of the trial" is a "fundamental right[ ] of each criminal defendant." *Rushen*, 464 U.S. at 117, 104 S.Ct. 453. However, "no constitutional error results if a defendant knowingly and voluntarily waives his right to be present" at any stage of the trial. *Cuoco v. United States*, 208 F.3d 27, 30 (2d Cir.2000). Lyon's attorney waived his right to be present at the interviews. Lyon does not assert that the waiver was involuntary. Further, Lyon has made no showing that he was prejudiced because of his absence from the jury interviews. Therefore, even if Lyon had been improperly excluded from the interviews, that exclusion would be deemed a harmless error. *Rushen*, 464 U.S. at 119–

20, 104 S.Ct. 453. Lyon's Ninth Claim must be dismissed.

## C. Prosecution's Failure to Disclose Exculpatory Information

Lyon's Sixth Claim asserts that he was prejudiced by the prosecutor's untimely disclosure of exculpatory information in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). (Pet.¶ 12(F).) He does not elaborate in the Petition as to the nature of the exculpatory material. However, in the *pro se* brief that Lyon filed in his direct appeal, he cited non-disclosure of Wright's plea bargain and initial statement to police as the basis for his *Brady* claim. (Ex. D, at 5–10.)

> [S]uppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material to either guilt or punishment irrespective of the good faith or bad faith of the prosecution.

*Brady*, 373 U.S. at 87, 83 S.Ct. 1194. Evidence is material when "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). When a habeas claim is based on belated disclosure of *Brady* information, rather than non-disclosure of such information, a petitioner is not entitled to reversal, even if the information is deemed material, "unless he can show that the delayed disclosure caused him prejudice." *United States v. Diaz*, 922 F.2d 998, 1007 (2d Cir.), cert. denied, 500 U.S. 925, 111 S.Ct. 2035, 114 L.Ed.2d 119 (1991). In *Diaz*, information that impeached the credibility of a key prosecution witness was disclosed during the trial, after the witness had completed his testimony. The Second Circuit held that the defendant had not been prejudiced since defense counsel was able to introduce the information through the testimony of another witness and used it effectively in summation, and since the court

offered to permit the defendant to recall the witness to the stand, in order to cross-examine him regarding the conflicting testimony. *Id.* at 1007.

■ Although Lyon's counsel complained about belated disclosure of Wright's prior statement and the terms of the plea agreement, the statement and agreement were disclosed prior to the trial. Counsel effectively used the information in his opening statement, during cross-examination of Wright and Marro and in summation. Also, Wright's credibility was already subject to question, given his prior criminal record, his admitted involvement in the plan to burglarize the Willses' and the timing of his contact with police. Evidence is not material under *Brady* if it " 'merely furnishes an additional basis on which to impeach a witness whose credibility has already been shown to be questionable.' " *United States v. Amiel,* 95 F.3d 135, 145 (2d Cir.1996) (quoting *United States v. Wong,* 78 F.3d 73, 79 (2d Cir.1996)).

The prosecutor's belated disclosure of information did not so prejudice Lyon as to deprive him of due process. Lyon's Sixth Claim must therefore be dismissed.

■ Lyon's Seventh Claim asserts that Marro "knowingly destroyed material that would have been useful to the defense," namely notes from the initial interview with Wright. (Pet.¶ 12(G).) Lyon does not offer a basis for his contention that Marro kept notes of his initial interview of Wright, much less that Marro destroyed such notes. Further, Lyon does not allege that Marro's notes, if they existed, included any new exculpatory information. Hence, their only usefulness would have been to impeach Marro's testimony. Impeachment evidence is material if "the witness in question supplied the only evidence linking the defendant to the crime ... [or] the only evidence of an essential element of the offense." *United States v. Avellino,* 136 F.3d 249, 256 (2d Cir.1998). Since Marro's testimony did not directly link Lyon to the crime or provide an es-

sential element of the offense, evidence impeaching him would not have been material under *Brady.* Lyon has not shown that Marrow destroyed interview notes or that such notes, if they existed, would have been *Brady* material. His Seventh Claim must be dismissed.

■ Lyon's Fourteenth Claim reiterates the above *Brady* claims, with the added assertion that information withheld by the prosecutor was "*Rosario* ... material." (Pet.¶ 14(N).) *People v. Rosario,* 9 N.Y.2d 286, 213 N.Y.S.2d 448, 173 N.E.2d 881 (1961), anticipated *Brady* in holding that suppression of evidence favorable to the accused violates due process. However, *Rosario* went beyond requirements later defined in *Brady* and its progeny, holding that a prosecutor must disclose *any* prior statement of its witness, regardless of whether it is favorable to the accused. To the extent that it exceeded Constitutional requirements, *Rosario* defines state law and is not a basis for a federal habeas claim. *See* Practice Commentary to CPL § 240.25 (McKinney's) on the difference between state disclosure requirements under *Rosario* and Federal requirements under *Brady.* To the extent that it enunciated Due Process requirements subsequently defined in *Brady,* citation of *Rosario* adds nothing to the Sixth and Seventh Claims. Lyon's Fourteenth Claim must be dismissed.

### D. Perjured Testimony

■ Lyon's Eighth and Twelfth Claims assert that he was denied a fair trial by the prosecutor's use of perjured testimony. A prosecutor's "deliberate deception of a court and jurors by the presentation of known false testimony is incompatible with 'rudimentary demands of justice,' " and violates a defendant's right to a fair trial. *Giglio v. United States,* 405 U.S. 150, 153, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) (quoting *Mooney v. Holohan,* 294 U.S. 103, 112, 55 S.Ct. 340, 79 L.Ed. 791 (1935)).

In support of his Eighth Claim, Lyon refers to Wright's testimony that Robert Wills called his wife's name and tried to stand after Lyon hit him with the hatchet. (H38–39.) He cites the opinion of the coroner, Dr. Benedek, that the blow described by Wright "probably would cause unconsciousness," (C727–28), and reasons that an unconscious person would not be able to speak or attempt to stand.[6] While the contrast between the coroner's testimony and Wright's may arguably have cast doubt on the latter's description of the crime, it falls short of demonstrating that Wright perjured himself, much less that the prosecution knowingly adduced perjured testimony from Wright.

In support of his Twelfth Claim, Lyon refers to Wright's testimony that he was not promised a specific sentence; and purports to quote District Attorney Bates that he did not speak "with either Mr. Hemingway or Sharon Ratley concerning the nature of the immunity that you were prepared to grant Mr. Wright[.]" (Pet. ¶ 12(L).)[7]

Ratley was the prosecutor and Hemingway was Wright's defense attorney in the Georgia case. Thus, the gist of the claim is that the prosecutor elicited false testimony from Wright and perjured himself regarding terms of the plea agreement. However, it is clear from the trial record that the jury was not misled as to the terms of the agreement with Wright. Indeed, when Wright initially misspoke regarding his sentence under the agreement, the prosecutor, through further questions, brought out accurate information from Wright. (H8–9.) There is no basis for inferring that the prosecutor perjured himself or encouraged Wright to lie regarding the agreement. Lyon's Eighth and Twelfth Claims must be dismissed.

### E. Summation and Jury Charge

Lyon's Eleventh Claim asserts that he was denied a fair trial by the "cumulative effect" of comments made by the prosecutor in his summation, and the trial court's charge to the jury. In Lyon's direct appeal, the Appellate Division held that,

[al]though the prosecutor impermissibly bolstered his own witnesses' testimony and impugned the defense, we cannot say that defendant was deprived of a fair trial. This misconduct also was of defendant's own making as the result of defense counsel's summation attacking the veracity of the prosecution's witnesses.

*Lyon*, 134 A.D.2d at 910, 521 N.Y.S.2d 930.

■■■ A prosecutor's comments violate due process when they are so prejudicial as to deprive the defendant of a fair trial. *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986). Here, the prosecutor countered defense counsel's accusation that Marro destroyed exculpatory evidence by asserting that Marro conducted an honest investigation. Although the comments amount to vouching for a prosecution witness, they were a response to defense counsel's attack on the witness' veracity. *United States v. Modica*, 663 F.2d 1173, 1181 (2d Cir.1981). The state court found that the prosecutor's comments did not deny Lyon a fair trial, and there is no compelling evidence to the contrary.

■■■ The judge instructed the jury that it "may" infer intent "from the natural and ordinary consequences of a person's actions" but was "not required to do so."

---

6. Lyon's counsel made this argument in summation. (C856.) It is conceivable that the jury accepted the argument, since it found Lyon not guilty of intentional murder but guilty of felony murder.

7. Although the statement is in quotation marks, it does not identify the speaker or provide a page citation for the quotation. Its context suggests that the statement was made by Bates, since he was the person in a position to offer a plea deal. An exact match for the quotation could not be located; however, Bates testified at the pre-trial hearing regarding negotiations with Hemingway and Ratley at C120–23.

The judge stressed that such an inference "does not shift any burden of proof whatsoever. The burden of proof as to each element of the crime submitted to· you remains upon the People." (C960–61.) In *Sandstrom v. Montana,* 442 U.S. 510, 524, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979), the Supreme Court held that a jury instruction that suggested that the burden of proof on the issue of intent shifted to the defendant violated due process. Assuming that the above-quoted instruction implicated *Sandstrom,* it is clear that the jury charge, taken as a whole, did not prejudice the jury's deliberations. *United States v. Allah,* 130 F.3d 33, 42 (2d Cir.1997) (citing, *inter alia, Francis v. Franklin,* 471 U.S. 307, 314–15, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985)). The trial court's charge to the jury made clear that the prosecution sustained the burden of proof on intent and that it was up to the jury to decide whether to infer intent from the defendant's actions; even if there were any error in the wording of that charge, it was "in the midst of a balanced statement" as to the burden of proof on intent. *Allah,* at 42–43 (quoting *Rock v. Coombe,* 694 F.2d 908, 915–17 (2d Cir.1982), *cert. denied,* 460 U.S. 1083, 460 U.S. 1083, 76 L.Ed.2d 345 (1983)). Since neither the summation nor the jury charge violated due process, Lyon cannot claim prejudice from the "cumulative" effect of those alleged violations. His Eleventh Claim must therefore be dismissed.

## F. Consecutive Sentence

■■■■ Lyon claims that imposition of consecutive sentences for the felony murder convictions violated his Constitutional rights. (Pet.¶ 12(E).)[8] The Fifth Amendment provides that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb." *U.S. Const.* amend. V, cl. 2. Although the Double Jeopardy Clause "protects against mul-

tiple punishments for the same offense," *North Carolina v. Pearce,* 395 U.S. 711, 717, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969), it does not prohibit a court from imposing separate punishments based on two criminal offenses, even when the offenses are premised on the same course of conduct. *Missouri v. Hunter,* 459 U.S. 359, 366, 103 S.Ct. 673, 74 L.Ed.2d 535 (1983). "With respect to cumulative sentences imposed in a single trial, the Double Jeopardy Clause does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended." *Id.*

It is clear that New York Penal Law contemplates the imposition of consecutive sentences for two felony murder convictions arising out of the same felonious conduct. *People v. Brathwaite,* 63 N.Y.2d 839, 843, 482 N.Y.S.2d 253, 472 N.E.2d 29 (1984). The fact that Lyon's conviction was premised on participation in the underlying felony, and not on a finding that he was the participant who killed Mr. and Mrs. Wills is irrelevant to double jeopardy analysis. Lyon's sentences were imposed for two separate felony-murder convictions. The state legislature is entitled to impose consecutive punishments for those convictions, and it is clear that such was the intent of the legislature. Lyon's Fifth Claim must therefore be dismissed.

## G. DNA Evidence

■■■ Lyon's Sixteenth Claim asserts that he was denied due process because of "the court[']s decision denying forensic deoxyribonucleic acid ('DNA') testing." (Pet. ¶ 12(P).) Respondent notes that Lyon never requested DNA testing prior to or during his trial and first sought such testing in his CPL § 440 motion. (Item no. 10, at 8.) Lyon does not contest this, stating that a request could not have been made at trial "for the simple reason that

---

**8.** Lyon claims that the sentence denied his "rights secured by the Sixth and Fourteenth Amendments." (Id.) He does not identify the rights in question, however. This Court pre-

sumes that Lyons' claim is premised on the Double Jeopardy Clause of the Fifth Amendment and the Due Process Clause of the Fourteenth Amendment.

there was no DNA testing in 1982." (Item no. 13, at 9.)

The state court denied Lyon's request, holding that DNA test results would be

immaterial to the defendant's conviction. The absence of any DNA result connecting the defendant to the homicide would not materially affect the conviction for a felony murder and would not establish innocence or otherwise undermine the verdict.

*People v. Lyon*, Decision, November 25, 1997, at 4.

Lyon's DNA claim is not premised on the alleged denial of any Constitutional right during his trial. As the Supreme Court noted in *Herrera v. Collins*, 506 U.S. 390, 399, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993), "[c]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying criminal proceeding." *Herrera* did not rule on whether a "freestanding" claim of innocence could ever be a basis for habeas relief. However, it noted that "the threshold showing for such an assumed right would necessarily be extraordinarily high." *Id.* at 417, 113 S.Ct. 853. Lyon does not come close to meeting the "extraordinarily high" threshold for obtaining habeas relief based on his DNA claim.

Lyon has not shown that there is any "new evidence" to support his request. He claims that blood found under Mrs. Wills' fingernails should have been subjected to DNA testing and speculates that the results of such tests would show that he was not the person who had direct contact with her. However, Lyon's felony-murder conviction is premised on his participation in a felony during which the victims were murdered. The state was not required to prove that Lyon had physical contact with either victim and DNA analysis could not establish Lyon's innocence regardless of the test results. Lyon's Sixteenth Claim must therefore be denied.

### *CONCLUSION*

For the above stated reasons, Petitioner's Petition for habeas corpus under 28 U.S.C. § 2254 is DENIED, and this proceeding is DISMISSED. Further, because Lyon has failed to make a substantial showing of a denial of a constitutional right, I deny a certificate of appealability. 28 U.S.C. § 2253.

### *ORDER*

It is hereby ORDERED that Petitioner's petition for habeas corpus under 28 U.S.C. § 2254 is DENIED, and the action is DISMISSED.

IT IS SO ORDERED.